**FILED**
DEC - 9 2013  12-9-13
THOMAS G BRUTON
CLERK, U S DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORIE COX,<br><br>Plaintiff,<br><br>vs.<br><br>JED CAPITAL, LLC; SARASTRO CAPITAL LLC; NEED TO KNOW NEWS LLC; and JOHN HARADA,<br><br>Defendants | 1:13-cv-08793<br>Judge James F. Holderman<br>Magistrate Judge Young B. Kim<br><br>COMPLAINT<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff Gregorie Cox, by and through undersigned counsel, herewith files his Complaint against Jed Capital, LLC; Sarastro Capital, LLC; Need to Know News, LLC; and John Harada, and states as follows:

### PARTIES

1.  Plaintiff, Gregorie Cox (hereinafter "Cox"), is an individual currently residing in Wheaton, Illinois. Until June 18, 2008, Cox was a member of and held a 5% equity interest in Defendant Sarastro Capital LLC (hereinafter "Sarastro"), subject to the terms and conditions of the Operating Agreement of Sarastro dated January 5, 2006 (hereinafter "Operating Agreement"). A true and accurate copy of the Operating Agreement is attached hereto as *Exhibit "1."*

2. Defendant Sarastro is a Delaware limited liability company authorized to transact business in Illinois and in fact conducts business within this District. Sarastro's primary purpose is to own a membership interest in and to serve as Manager of Defendant, Need To Know News LLC.

3. Defendant Need To Know News LLC (hereinafter "NTKN") is an Illinois limited liability company with its principal place of business in Illinois. NTKN broadcasts financial news through the internet.

4. Defendant Jed Capital LLC (hereinafter "JED") is an Illinois limited liability company and is the manager of Sarastro, which is the sole member of NTKN.

5. Defendant John Harada (hereinafter "Harada") is an individual residing in Illinois. Harada is the controlling party and majority owner of JED and Sarastro.

## JURISDICTION

6. Count 5 is based upon violations of § 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j, *et seq.*) and Rule 10b-5 (17 C.F.R. § 240.10 b-5).

7. Jurisdiction for all other counts of this Complaint is based upon pendent jurisdiction.

## VENUE

8. Venue is proper in the Northern District of Illinois as a preponderance of the conduct at issue took place within that district.

## STATEMENT OF FACTS

9. The primary purpose of Sarastro is to own a membership interest in, and to serve as manager of NTKN.

10. Cox, was employed by NTKN pursuant to an Employment Agreement between Cox and NTKN dated January 1, 2006 ("Employment Agreement"). A true and accurate copy of the Employment Agreement is annexed hereto as **Exhibit "2."**

11. The Employment Agreement provides:

> *The Employment Term shall terminate upon the occurrence of any of the following events: . . . (d) at any time by the Company for Cause, as defined in Section 2.2; or (e) at any time by the Supervisor without Cause.*

(*See* Ex. 2, at Section 2.I.)

12. The Employment Agreement further provides, in pertinent part:

> *The term "Cause" as used herein shall mean the following:*
>
> *(c) Provision of written notice of termination for cause from JED Capital to Employee, if the cash flow from the operations of the Company is less than negative $5,000.00 per month for any one month period beginning on or after July 1, 2006 and ending on December 31, 2007. For purposes of this Section 2.2(c), cash flow from operations of the Company shall be determined in the manner set forth in Section 15.4(a) of the Operating Agreement of Sarastro.*
>
> \* \* \*
>
> *In the event this Agreement is terminated by the Company without Cause, the Company shall pay Employee all amounts that would have been payable to him.*

13. The Employment Agreement further provides:

> *Attorneys' Fees. In the event of a breach of any provision of this Agreement, the breaching party shall pay to the non-breaching party: (i) the damages arising from such breach and (ii) all of its attorneys' fees and cost reasonably incurred as a result of such breach.*

Cox was terminated as an employee of NTKN on or about August 8, 2006. Said termination was engineered by Harada for the purposes of (a) supporting the cover up by Harada

of the true and accurate value of NTKN and Sarastro and (b) depriving Cox of his fair share of the value of NTKN and Sarastro.

14. The Operating Agreement further provides:

> *For purposes of this <u>Section 15.4</u>, cash flow from the operations of Need to Know News will be calculated in a manner consistent with the calculations of Operating Cash Flow for the Company; provided, however, with respect to any employee of Need to Know News who was hired at the direction of the Manager without the consent of one of the Employee Members, the employee expense related to the employment of such person shall not be deducted in calculating cash flow from operations of Need to Know News. The Employee Members hereby consent to the hiring by Need to Know News of each of the Employee Members, Dennis Moore and Nancy Cohen.*

15. The Operating Agreement further provides:

> *In the event of the termination of an Employee Member's employment with Need to Know News by the Company without "Cause" (as such term is defined in the Employee Member's employment agreement), . . . JED Capital shall thereafter have the ongoing right and option, for so long as the Employee Member is a Member of the Company, to acquire all or any of the Interests of such Member at a price equal to Fair Market Value.*

16. The Operating Agreement defines "Fair Market Value" as:

> *The fair market value of the Company, as agreed upon by the Company and an Employee Member that is selling its shares pursuant to this Section 15.4, or in the absence of such agreement, as determined by an independent appraiser jointly selected by the Company and Employee (or employee's beneficiaries in the event Employee has died); provided, however, that in the event such parties are unable to agree on selection of an independent appraiser, the Company shall designate an independent appraiser, Employee (or Employee's beneficiaries in the event Employee has died) shall designate an independent appraiser, and the two independent appraisers so selected shall mutually designate a third independent appraiser whose determination of fair market value of the Company shall be binding on the parties.*

17. The Operating Agreement also provides that with respect to books and records:

> *The books and records shall be open to the inspection and examination of the Members or their duly authorized representatives during reasonable business hours... Each member shall have the right, upon reasonable demand and for any purpose reasonably related to the Member's interest in the Company, to obtain from the Manager from time to time the records referred to in this <u>Section 10.1</u> and other information regarding the affairs of the Company as is just and reasonable.*

18. The Operating Agreement further provides:

> *On or before 120 days after the end of each fiscal year the Manager shall prepare or cause to be prepared by a certified public accountant engaged by the Manager on behalf of the Company (i) a balance sheet as of the end of such fiscal year and statements of income and Members' equity for such fiscal year, all of which shall be prepared in accordance with generally accepted accounting principles and shall reflect the differences resulting from the different allocations, if any, of the profits and losses of the Company for income tax and accounting purposes, (ii) a cash flow statement, (iii) a report summarizing the fees and other remuneration paid by the Company for such fiscal year to the Members and the Manager or an Affiliate of any one of them, (iv) a report of the activities of the Company during such fiscal year and (v) a statement showing the amounts distributed from operations during the year and amounts from operations during the prior year. The Manager shall, on request of the Person, and subject to the Members' obligation for advance payment under Section 10.4, send a copy of all or any one of statements to any Person who was a holder of an Interest at any time during the fiscal year then ended.*

> *15.4(g) if a Capital transaction occurs within six (6) months following any acquisition by JED Capital of Interests of another member pursuant to subsection 15.4(a,b,d), the purchase price otherwise payable to the applicable Member(s) shall be increased to reflect the proceeds of such Capital Transaction such Member would have been entitled to if such Member's Interests had not been acquired by JED Capital at the time of such Capital Transaction.*

> *22.1 Determination of Accountants Binding. "the opinion of the independent certified public accountants retained by the Company from time to time shall be final and binding with respect to all computations and determinations required to be made under this Agreement..."*

19. As stated in ¶13 on August 8, 2006, NTKN terminated Cox's employment without cause. This termination was part and parcel of Harada's scheme to deprive Cox of his fair share of the value of NTKN and Sarastro.

20. On or about August 21, 2007, JED brought a Complaint for Declaratory Judgment against Cox in the Circuit Court of Cook County, Illinois alleging that, pursuant to the terms and conditions in *Exhibit "2"* that Sarastro had attempted to purchase Cox's interest in Sarastro, but that Cox had improperly refused to tender his interest in Sarastro. A true and correct copy of JED's Complaint is annexed hereto as *Exhibit "3."*

21. Shortly after the filing of *Exhibit "3," supra*, Cox responded and through counsel filed an Answer, Affirmative Defenses and Counterclaims, a true and correct copy of which is annexed hereto as *Exhibit "4."* In *Exhibit "4," supra*, Cox claimed that JED failed to offer Cox fair market value for his interest in Sarastro, that JED failed to follow the necessary formalities for purchasing Cox's interest in Sarastro, that Cox had no obligation to sell his interest in Sarastro, and that NTKN had terminated his employment without cause.

22. During the course of the legal proceedings described above, the parties entered into settlement discussions aimed at the valuation of Cox's interest in Sarastro and the purchase of same from Cox by JED. In connection therewith, Cox was presented with Financial Statements and Supplementary Information of Sarastro for the years ended December 31, 2007 and December 31, 2006. Said financial statements were presented to Cox and his counsel by JED's counsel shortly after March 13, 2008. A copy of said financial statements is attached hereto as *Exhibit "5."*

23. The presentation of this financial material to Cox was the first time that Cox had been provided any material financial information regarding Sarastro and NTKN. Up until the

6

presentation of *Exhibit "5,"* Harada had kept all material, important and significant financial information about Sarastro, NTKN and JED to himself, refusing to share any such information with the members of the Defendant limited liability companies that he controlled. All members of these Defendant limited liability companies were entitled both by applicable state laws and the terms and conditions of the Operating Agreements of these entities to see and review all books and records of these entities *and* to be kept current on all significant financial information affecting these entities and the valuation of their interests in same.

24. In Note 2 to *Exhibit "5,"* *supra*, Sarastro's accountants noted that Sarastro had deferred revenue of $815,994 for 2007 and $876,158 for 2006. Upon reviewing this information Cox believed that there was significant value to his 5% interest in Sarastro. Cox's counsel commenced asking material questions concerning the value of Sarastro. JED's counsel refused to provide information that was directly relevant to the value of Sarastro as would be reflected in the information provided in Note 2 to *Exhibit "5."*

25. In connection with this deferred revenue issue, Sarastro's accountants, on or after May 28, 2008, issued a second or revised draft of the Financial Statements for Sarastro for the years ending December 31, 2007 and December 31, 2006. The issuance of said Revised Financial Statements was in violation of the terms and conditions of Section 22.1 of the Operating Agreement. In said revised draft, the deferred revenue was to a large extent "reclassified" as "work in progress," and the deferred revenue was downgraded to $178,095 and $2,795 for 2007 and 2006 respectively. A true and correct copy of the revised draft is annexed hereto as *Exhibit "6."*

26. The reclassification and downgrade of the representations made in *Exhibit "5,"* *supra*, caused a material lessening of the valuation of Sarastro.

27. On information and belief, Cox alleges that the revised draft was ordered by Harada for the sole purpose of reducing the value of Sarastro in connection with the negotiations related to the purchase of Cox's interest in Sarastro.

28. In support of the allegations made by Cox in ¶27 above, Cox alleges that at the same time as the Defendants were negotiating the value of Cox's interest in Sarastro and representing to Cox that his interest was worth nothing, Harada was negotiating with another employee of JED to purchase a 10% interest in NTKN for the sum of $200,000 and, in fact, did sell such a 10% interest to that other individual for the sum of $200,000.

29. The negotiations and sale referenced in ¶28 were never disclosed to Cox notwithstanding this fact that pursuant to 15.4(g) of the Operating Agreement, Cox was entitled to know about any such transaction involving a Capital Transaction and was entitled to an increase in the purchase price paid by JED Capital for the Interest to reflect the proceeds of such Capital Transaction.

30. Prior to 2008, the revenues of NTKN were rising sharply due to the substantial increase in fees NTKN was receiving from the sale of its electronic news feed to institutional trading firms. Indeed, the initial pre-2008 fee of $5,000 per month was on a sharp upward slope by early 2008 and on information and belief had exceeded the monthly sum of $30,000 by 2013. This information was material to the valuation of Cox's interest in Sarastro in 2008 and was never disclosed to Cox. On information and belief the deferred revenue figures disclosed to Cox in *Exhibit "5"* were the result of this increase in fees received by NTKN. The increase in these fees had a material effect on the valuation of Sarastro's and Cox's interest in Sarastro.

31. On or about June 18, 2008, the Defendants and Cox reached a settlement agreement by which Cox received the sum of $15,000 for the release of all of his claims and the tender of his

membership interest in Sarastro. A true and correct copy of this Settlement Agreement and Mutual Release is annexed hereto as *Exhibit "7."*

32. Cox entered into *Exhibit "7," supra,* in complete ignorance of the information described above concerning Sarastro's revenues, and concerning JED Capital's Capital Transaction as described in ¶28 of this Complaint, which information had a material impact on the value of Sarastro and Cox's interest in Sarastro. As a direct result of this lack of information concerning Sarastro's revenues and said Capital Transaction, Cox sold his interest in Sarastro for far less than it was worth and the Defendants received a windfall in purchasing Cox's interest in Sarastro for far less than it was worth.

33. At the time of the sale of Cox's interest in Sarastro, the Defendants all had personal knowledge of the information concerning Sarastro's increasing revenues and value and deliberately, intentionally and with scienter did not provide said information to Cox despite their bedrock obligations to do so. The failure to provide said information was part of the Defendants' scheme to deprive Cox of the fair value of his interest in Sarastro and NTKN.

34. At all times material to this Complaint, Harada was the controlling member/manager of Sarastro, JED and NTKN. Despite the fact that Cox was an equity owner of Sarastro, and thereby a controlling person and principal/agent of NTKN, Cox was intentionally, willfully, provided with inaccurate financial information material concerning said entities. Cox had no information whatsoever on the management of any of said entities. Cox was never consulted by Harada as to any management issues concerning said entities, and no member meetings were ever held by said entities. Further, Harada had executive authority according to the Operating Agreement of JED, which authority left him in complete control of all three entities and which control he exercised at all times material to this action without advising his co-members of

any decisions he made, such decisions being solely in his personal best interest. In connection with Cox's investment in Sarastro, he was fully and completely dependent on the time, efforts and success of Harada and other employees and members of Sarastro, JED and NTKN.

## COUNT I
## FRAUD IN THE INDUCEMENT/RECISSION

35. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9- 34 above and incorporates same into Count I.

36. The actions of the Defendants as stated in ¶35 were intentionally and willfully designed and intended to cause Cox to execute *Exhibit "7"* without having the full knowledge of the finances of Sarastro, JED and NTKN, which knowledge was critical and material information necessary to properly evaluate the value of Sarastro in connection with the negotiations leading to the purchase of his interest in Sarastro by the Defendants.

37. It was the intention of the Defendants to cause Cox to sell his interest in Sarastro at a value that was far less than its actual worth so that the Defendants could benefit from the acquisition of that interest by purchasing same at a price that was advantageous to said Defendants.

38. The provision of the revised financials shown on *Exhibit "6"* to Defendant, the failure to advise Cox of the sale of an interest in JED to a third party as described in ¶36 and the failure to advise Cox of the increase in monthly revenues for NTKN's subscription services was in violation of the contractual, fiduciary and legal duties imposed on the Defendants as a Seller, fiduciary and partner in the relevant entities involved in this case.

39. The actions of the Defendants as described in ¶36 were fraudulent and were designed and intended to induce Cox to enter into *Exhibit "7,"* which contract was not a fair and reasonable agreement which properly reflected the value of Sarastro at the time of its execution,

40. Had the information stated in ¶38 been provided to Cox prior to the execution of *Exhibit "7,"* Cox would not have executed *Exhibit "7"* thereby giving up his claims stated in *Exhibit "2"* in return for the unfair value of Sarastro intentionally misrepresented in *Exhibit "7."*

41. Cox's actions in executing *Exhibit "7"* under the circumstances was reasonable as he had no reason to know that the representations being made to him at that time were untrue or that there was material financial information that the Defendants were obligated to disclose and were not disclosing.

42. Cox was greatly damaged by his execution of *Exhibit "7."*

43. As a matter of equity Cox is entitled to rescission of *Exhibit "7"* and the reinstatement of his claims in *Exhibit "2."*

## COUNT II
## BREACH OF CONTRACT

44. Plaintiff hereby restates the allegations contained in ¶¶ 9 thru 43 of this Complaint and hereby incorporates same into Count II.

45. The actions of the Defendants in failing to honor the terms and provisions of § 15.4(e), § 10.1, § 10.3 and § 22.1 of the Sarastro Operating Agreement were principal and immediate causes leading to Cox's execution of *Exhibit "7."*

46. The failure of Defendants to honor said provisions of the Sarastro Operating Agreement constitute a breach of the Operating Agreement by the Defendants which breach

greatly damaged Cox. Cox is therefore entitled as a matter of law damages in contract reasonably flowing from the aforementioned breaches, and as a matter of equity rescission of *Exhibit "7"* and reinstatement of the claims contained in *Exhibit "2."*

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
## AND PROSPECTIVE ECONOMIC ADVANTAGE

47. Plaintiff hereby restates the allegations contained in ¶¶ 9 through 46 above and incorporates same into Count III.

48. The actions of Harada were either reckless or intentionally planned, intended and carried out for the purpose of and with the intent of improperly and maliciously depriving Cox of the fair value of his interest in Sarastro. At all times material to this action, Harada knew that his actions as described herein would have the consequence of so depriving Cox of the fair value of his interest in Sarastro and would further have the consequence of unjustly enriching Harada, JED, NTNK and Sarastro. Said actions of Harada constitute tortious interference with the contract between Cox and Sarastro and further constitute a tortious interference with Cox's prospective economic advantage. Harada is therefore personally liable to Cox for damages caused by Harada's wrongful, tortious interference.

## COUNT IV
## VIOLATION OF THE ILLINOIS LIMITED LIABILITY COMPANY ACT

49. Plaintiff hereby restates the allegations contained in ¶¶ 9 through 48 above and incorporates same into Count IV.

50. The actions of Harada as described in ¶49 of this Complaint constitute a breach of Harada's fiduciary duty of loyalty towards Cox as said duty is established by the Illinois Limited Liability Company Act, 805 ILCS 180/15--3.

51. Harada's breach of fiduciary duty has severely damaged Plaintiff. As such, Harada is liable for these damages sustained by Plaintiff.

## COUNT V
## VIOLATION OF SECTION 10/RULE 10b-5 OF FEDERAL SECURITIES LAWS
## (CORPORATE DEFENDANTS ONLY)

52. Plaintiff hereby restates the allegations contained in ¶¶ 9 through 51 above and incorporates same into Count V.

53. JED, Sarastro and NTKN (hereinafter the "Corporate Defendants"), in connection with the purchase and sale of securities in connection with the disposition in *Exhibit "7,"* by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a. employed devices, schemes, and artifices to defraud Plaintiff of the actual value of his securities and material information regarding such actual value;

    b. with respect to the actual value of Plaintiff's securities, made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon Plaintiff, who is a purchaser of the securities in question.

54. With respect to Plaintiff, the Corporate Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue

statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, the Corporate Defendants acted with scienter as to Plaintiff, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

55. By reason of the foregoing, the Corporate Defendants have violated Section 10(b) of the Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. The Corporate Defendants are each liable for damages sustained by Plaintiff by virtue of each of their violations of the aforementioned provisions of federal securities laws.

## COUNT VI
## VIOLATION OF CONTROL PERSON PROVISIONS
## OF FEDERAL SECURITIES LAWS (HARADA ONLY)

56. Plaintiff hereby restates the allegations contained in ¶¶ 9 through 55 above and incorporates same into Count VI.

57. Harada was a controlling person of the Corporate Defendants as that term is defined under Section 20(a) of the 1934 Act and Section 15 of the Securities Act of 1933 ("1933 Act") who explicitly or implicitly had the power to direct or cause the direction of the management and policies of each of the Corporate Defendants, including the provision of financial reports.

58. Harada as a controlling person of the Corporate Defendants, did not act in good faith in connection with the disposition of Plaintiff's securities. The actions of the Corporate Defendants in concealing the actual value of Plaintiff's securities were each conceived, planned, orchestrated and executed by Harada through the Corporate Defendants. As previously discussed in Count V, such conduct violated Section 10 of the Exchange Act and Rule 10b-5 promulgated thereunder.

59. Harada is therefore liable as a controlling person of the Corporate Defendants for all damages sustained by Plaintiff with respect to the disposition of his securities wrongfully facilitated through *Exhibit "7."*

## COUNT VII
## VIOLATION OF ILLINOIS SECURITIES LAWS
## (CORPORATE DEFENDANTS ONLY)

60. Plaintiff hereby restates the allegations contained in ¶¶ 9 through 59 above and incorporates same into Count V.

61. The anti-fraud provisions of the Illinois Securities Law of 1953, 815 ILCS 5/12 ("ISL") deem it violative

> F. To engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.
>
> H. To sign or circulate any statement, prospectus, or other paper or document required by any provision of this Act or pertaining to any security knowing or having reasonable grounds to know any material representation therein contained to be false or untrue; and
>
> I. To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

62. The Corporate Defendants violated Sections 12F, 12H and 12I of the ISL, and each are therefore liable to Plaintiff for all damages sustained as a result of such violations.

## **PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that judgment be rendered in his favor and against the Defendants jointly, severally or otherwise in an amount of at least

$250,000, punitive damages of at least $750,000, attorneys' fees, costs, interest and all other legal and equitable relief requested herein or deemed proper by the Court.

## JURY TRIAL DEMANDED

Plaintiff requests a trial by jury before this Court on all issues so triable.

The Plaintiff, GREGORIE COX,
By his Attorney,


S/Robert D. Loventhal
ROBERT D. LOVENTHAL, ESQ.
BBO # 305940
21 CUSTOM HOUSE STREET
SUITE 210
BOSTON, MA 02110
(617) 723-2222 PH
(617) 723-9811 FX
Rdllaw99@aol.com   EMAIL