UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GREGORIE COX,<br>      Plaintiff,<br><br>      vs.<br><br>JED CAPITAL, LLC, SARASTRO CAPITAL LLC, NEED TO KNOW NEWS LLC AND JOHN HARADA<br>      Defendant. | DOCKET NO. 1:13-cv-08793<br><br>**PLAINTIFF'S SECOND AMENDED COMPLAINT**<br><br>Hon. James F. Holderman<br><br>Magistrate Judge Young B. Kim |

# PARTIES

1. The Plaintiff, Gregorie Cox, (hereinafter "Cox") is an individual currently residing in Wheaton, IL.  Until June 18, 2008 Cox was a member of and held a 5% equity interest in Sarastro Capital LLC (hereinafter "Sarastro"), subject to the terms and conditions of the Operating Agreement of Sarastro dated January 5, 2006 (hereinafter "Operating Agreement").  A true and accurate copy of Sarastro's Operating Agreement is attached hereto as **Exhibit 1**.

2. The Defendant, Sarastro Capital, LLC, is a Delaware limited liability company doing business in Illinois.  Sarastro's primary purpose is to own a membership interest in and to serve as Manager of the Defendant, Need To Know News LLC.

3. The Defendant, Need To Know News LLC (hereinafter "NTKN") is a limited liability company with its principal place of business in Illinois.  NTKN broadcasts financial news through the internet.

4. The Defendant, Jed Capital LLC (hereinafter "JED") is an Illinois limited liability company and is the manager of Sarastro which is the sole member of NTKN.

5. The Defendant, John Harada, (hereinafter "Harada") is an individual residing in Illinois.  Harada is the controlling party and majority owner of JED and Sarastro.

# JURISDICTION

6. Jurisdiction for Count 5 of this Complaint is based upon Federal question jurisdiction, 28 U.S.C. Section 1332.  Count 5 is based upon violations of § 10(b) of the Security and Exchange Act of 1934 (15 U.S.C. §78j(b) and Rule 106-5 (17 C.F.R. 240, 10 b-5).

7. Jurisdiction for all other counts of this Complaint is based upon pendent jurisdiction.

## VENUE

8. Venue is proper in the Northern District of Illinois.

## (FACTUAL BACKGROUND)

9. The primary purpose of Sarastro is to own a membership interest in, and to serve as manager of NTKN.

10. Cox, was employed by NTKN pursuant to an Employment Agreement between Cox and NTKN dated January 1, 2006 ("Employment Agreement"). (A true and accurate copy of the Employment Agreement is attached hereto as **Exhibit 2**.

11. The Employment Agreement provides:

> The Employment Term shall terminate upon the occurrence of any of the following events: . . . (d) at any time by the Company for Cause, as defined in Section 2.2; or (e) at any time by the Supervisor without Cause.

(*See* Ex. 2, at Section 2.1.)

12. The Employment Agreement further provides, in pertinent part:

> The term (Cause) as used herein shall mean the following:
>
> (c) Provision of written notice of termination for cause from JED Capital to Employee, if the cash flow from the operations of the Company is less than negative $5,000.00 per month for any one month period beginning on or after July1, 2005 and ending on December 31, 2007. For purposes of this Section 2.2(c), cash flow from operations of the Company shall be determined in the manner set forth in Section 15.4(a) of the Operating Agreement of Sarastro.
>
> ***
> In the event this Agreement is terminated by the Company without Cause, the Company shall pay Employee all amounts that would have been payable to him.

(*See* Ex. 2, at Section 2.2)

13. The Employment Agreement further provides:

> Attorneys' Fees. In the event of a breach of any provision of this Agreement, the breaching party shall pay to the non-breaching party: (i) the damages arising from such breach and (ii) all of its attorneys' fees and cost reasonably incurred as a result of such break.

(*See* Ex. 2, at Section 2.3)

Cox was terminated as an employee of NTKN on or about August 8, 2006. Said termination was engineered by Harada in bad faith for the purpose of redeeming a $15,000 promissory note to force a transfer of Cox's interest to Harada, and when that failed after Cox paid the note, of concealing information material to the value of NTKN and Sarastro from him, of presenting false information to him concerning NTKN's financial health, of misleading him away from NTKN's true and accurate value, and of depriving him of his fair share of the value of NTKN and Sarastro.

    14. The Operating Agreement of Sarastro provides:

For purposes of this Section 15.4, cash flow from the operation of Need to Know News will be calculated in a manner consistent with the calculations of Operating Cash Flow for the Company; provided, however, with respect to any employee of Need to Know News who was hired at the direction of the Manager without the consent of one of the Employee Members, the employee expense related to the employment of such person shall not be deducted in calculating cash flow from operations of Need to Know News. The Employee Members hereby consent to the hiring by Need to Know News of each of the Employee Members, Dennis Moore and Nancy Cohen.

(*See* Ex. 1 at Section 15.4(a))

    16. The Operating Agreement defines Fair Market Value as:

The fair market value of the Company, as agreed upon by the Company and an Employee Member that is selling its shares pursuant to this Section 15.4, or in the absence of such agreement, as determined by an independent appraiser jointly selected by the Company and Employee (or employee's beneficiaries in the event Employee has died); provided however, that in the event such parties are unable to agree on selection of an independent appraiser, the Company shall designate an independent appraiser, Employee (or Employee's beneficiaries in the event Employee has died) shall designate an independent appraiser, and the two independent appraisers so selected shall mutually designate a third independent appraiser whose determination of fair market value of the Company shall be binding on the parties.

(*See* Ex. 1 at Section 15.4(e))

    17. The Operating Agreement also provides that with respect to books and records:

The books and records shall be open to the inspection and examination of the Members or their duly authorized representatives during reasonable business

hours. . . Each member shall have the right upon reasonable demand and for any purpose reasonably related to the Member's interest in the Company, to obtain from the Manager from time to time the records referred to in this Section 10.1 and other information regarding the affairs of the Company as is just and reasonable.

(*See* Ex. 1 at Section 10.1)

18. The Operating Agreement further provides:

On or before 120 days after the end of each fiscal year the Manager shall prepare or cause to be prepared by a certified public accountant engaged by the Manager on behalf of the Company (i) a balance sheet as of the end of such fiscal year and statements of income and Members' equity for such fiscal year, all of which shall be prepared in accordance with generally accepted accounting principles and shall reflect the differences resulting from the different allocations, if any, of the profits and losses of the Company for income tax and accounting purposes, (ii) a cash flow statement, (iii) a report summarizing the fees and other remuneration paid by the Company for such fiscal year to the Members and the Manager or an Affiliate of any one of them, (iv) a report of the activities of the Company during such fiscal year and (v) a statement showing the amounts distributed from operations during the year and amounts from operations during the prior year. The Manager shall, on request of the Person, and subject to the Members' obligation for advance payment under Section 10.4, send a copy of all or any one of statements to any Person who was a holder of an Interest at any time during the fiscal year then ended.

(*See* Ex. 1 at Section 10.3)

15.4(g) if a Capital transaction occurs within six (6) months following any acquisition by JED Capital of Interests of another member pursuant to subsection 15.4 (a, b, d), the purchase price otherwise payable to the applicable Member(s) shall be increased to reflect the proceeds of such Capital Transaction such Member would have been entitled to if such Member's Interests had not been acquired by JED Capital at the time of such Capital Transaction.

(*See* Ex. 1 at Section 15.4(8))

22.1 Determination of Accountants Binding. "the opinion of the independent certified public accountants retained by the Company from time to time shall be final and binding with respect to all computations and determinations required to be made under this Agreement. . ."

(*See* Ex. 1 at Sec. 22.1)

19. As stated in ¶13 on August 9, NTKN terminated Cox's Employment without cause. This termination was part and parcel of Harada's scheme to deprive Cox of his fair share of the value of NTKN and Sarastro.

20. On or about August 21, 2007 JED brought a Complaint for Declaratory Judgment against Cox in the Circuit Court of Cook County Illinois alleging that, pursuant to the terms and conditions on **Exhibit 1** and **2** that Sarastro had attempted to purchase Cox's interest in Sarastro but that Cox had improperly refused to tender his interest in Sarastro. A copy of said Complaint is attached hereto as **Exhibit 3**.

21. Shortly after the filing of Exhibit 3, Cox filed an Answer, Affirmative Defenses and Counterclaims to Exhibit 3, which document is attached hereto as **Exhibit 4**. In Exhibit 4 Cox claims that JED failed to offer Cox fair market value for his interest in Sarastro, that JED failed to follow the necessary formalities for purchasing Cox's interest in Sarastro, that Cox had no obligation to sell his interest in Sarastro, and that NTKN had terminated his employment without cause.

22. During the course of the legal proceedings described above the parties entered into settlement discussions aimed at the valuation of Cox's interest in Sarastro and the purchase of same from Cox by JED. In connection therewith Cox was presented with Financial Statements and Supplementary Information of Sarastro Capital LLC for the years ended December 31, 2007 and December 31, 2006. Said financial statements were presented to Cox shortly after March 13, 2008. A copy of said financial statements is attached hereto as **Exhibit 5**.

23. The presentation of this financial material to Cox was the first time that Cox had been provided any material financial information regarding Sarastro and NTKN. Up until the presentation of Exhibit 5 Harada had kept all material, important and significant financial information about Sarastro, NTKN and JED to himself, refusing to share any such information with the members of the Defendant limited liability company that he controlled. All members of these Defendant limited liability companies were entitled both by law and the terms and conditions of the Operating Agreements of these entities to see and review all books and records of these entities and to be kept current on all significant financial information affecting these entities and the valuation of their interests in same.

24. In Note 2 to Exhibit 5 Sarastro's accountants noted that Sarastro had deferred revenue of $815,994 for 2007 and $876,158 for 2006. Upon reviewing this information Cox believed that there was significant value to his 5% interest in Sarastro. Cox's attorneys commenced asking material questions concerning the value of Sarastro. JED's attorneys refused to provide information that was directly relevant to the value of Sarastro as would be reflected in the information provided in Note 2 to Exhibit 5.

25. In connection with this deferred revenue issue Sarastro's accountants, on or after May 28, 2008, issued a second or revised draft of the Financial Statements for Sarastro for the years ending December 31, 2007 and December 31, 2006. The issuance of said Revised Financial Statement was in violation of the terms and conditions of Section 22.1 of the Sarastro

5

Operating Agreement. In said revised draft the deferred revenue was to a large extent reclassified as work in progress and the deferred revenue was downgraded to $178,095 and $2,795 for 2007 and 2006 respectively. The revised draft is attached hereto as **Exhibit 6.**

26. The reclassification and downgrade of the representations made in Exhibit 5 caused a material lessening of the valuation of Sarastro.

27. On information and belief, Cox alleges that the revised draft was ordered by Harada in large part for the sole purpose of reducing the value of Sarastro in connection with the negotiations related to the purchase of Cox's interest in Sarastro.

28. In support of the allegations made by Cox in ¶ 27 above Cox alleges that at the same time as the Defendants were negotiating the value of Cox's interest in Sarastro and representing to Cox that his interest was worth noting, Harada was negotiating with another employee of JED to purchase a 10% interest in NTKN for the sum of $200,000.00 and, in fact, did sell such a 10% interest to that other individual for the sum of $200,000.

29. The negotiations and sale referenced in ¶ 28 were never disclosed to Cox notwithstanding this fact that pursuant to 15.4(g) of the Operating Agreement Cox was entitled to know about any such transaction involving a Capital Transaction and was entitled to an increase in the purchase price paid by JED Capital for the Interest to reflect the proceeds of such Capital Transaction.

30. Prior to 2008 the revenues of NTKN were rising sharply due to the substantial increase in fees NTKN was receiving from the sale of its electronic news feed to institutional trading firms. Indeed, the initial pre 2008 fee of $5,000 per month was on a sharp upward slope by early 2008 and on information and belief had exceeded the monthly sum of $31,000 by November, 2012. This information was material to the valuation of Cox's interest in Sarastro in 2008 and was never disclosed to Cox. On information and belief the deferred revenue figures disclosed to Cox in Exhibit 5 were the result of this increase in fees received by NTKN. The increase in these fees had a material effect on the valuation of Sarastro's and Cox's interest in Sarastro.

31. On or about June 18, 2008 the Defendants and Cox reached a settlement agreement by which Cox received the sum of $15,000 for the release of all of his claims and the tender of his membership interest in Sarastro. A copy of this Settlement Agreement and Mutual Release is attached hereto as **Exhibit 7**.

32. Cox entered into Exhibit 7 in complete ignorance of the information described above concerning Sarastro's revenues from its electronic newsfeed, and concerning JED Capital's Capital Transaction as described in 28-29 of this Complaint, which information had a material impact on the value of Sarastro and Cox's interest in Sarastro. As a direct result of this lack of information concerning Sarastro's revenues from its electronic newsfeed and said Capital Transaction, Cox sold his interest in Sarastro for far less than it was worth.

33. At the time of the sale of Cox's interest in Sarastro, the Defendants all had personal knowledge of the information concerning Sarastro's increasing revenues and value and deliberately did not provide said information to Cox despite their obligation to

do so. The failure to provide said information was part of the Defendants' scheme to deprive Cox of the fair value of his interest in Sarastro and NTKN.

  34. At all times material to this Complaint Harada was the controlling member/manager of Sarastro, JED and NTKN. Despite the fact that Cox was an equity owner of Sarastro, and thereby derivatively of NTKN, Cox was almost never provided with any financial information material or otherwise concerning said entities. Cox had no direct and truthful information whatsoever on the management of any of said entities. No member meetings were ever held by said entities. Further, Harada had executive authority according to the Operating Agreement of JED, which authority left him in complete control of all three entities and which control he exercised at all times material to this action without advising his co-members of any decisions he made, such decisions being solely in his personal best interest. In connection with Cox's investment in Sarastro, he was fully and completely dependent on the time, efforts and success of Harada and other employees and members of Sarastro, JED and NTKN.

  35. While Cox was a key employee of Sarastro in an operational sense he was totally reliant on Harada as to issues related to the finances and valuation of the business. Indeed, Cox despite having an MBA degree, had never previously been involved in the management and finances of an operating business. Further, Cox was blocked by Harada's concealment of the value of the business from obtaining relevant information as to that value. Specifically, in connection with the negotiations to sell Cox's interest, in Sarastro to Sarastro and/or Harada, Harada refused to turnover financial reports dated after December 31, 2007, concerning the finances of Sarastro and NTKN. In the reports turned over to Cox there is no mention of revenues and growth from NTKN's electronic news feed. Further, the financial reports turned over to Cox misrepresented the liabilities of the company in a manner that served to downgrade the value of Sarastro and NTKN. Notwithstanding several attempts on the part of Cox's then counsel to obtain updated information, Harada and his attorneys refused to provide same. Additionally, Cox had no information available to him prior to June 18, 2008 that Harada and the other Defendants were making financial misrepresentations to him. In justifiable and reasonable reliance on the misinformation provided to them, Cox determined just prior to June 18, 2008 that the offer to purchase his interest in Sarastro for $15,000.00 was fair and reasonable.

  More specifically,

   a. Harada, through his accountants, manipulated the accounting of NTKN by inflating G&A expenses (which only he controlled) to match the increase in combined revenues and deferred revenues in 2007, while creating a false personal loan to plug the fictitious cash outlays to the falsely inflated G&A expenses, something which had no explanation in reality or proper accounting. Harada did this to understate the financial health of NTKN in order to dissuade Plaintiff's attorneys from compelling the release of detailed financial data in relation to revenues, deferred revenue and expenses. From Plaintiff's attorneys' perspective, NTKN had enormous losses, such that stated expenses exceeded revenues by $662,000 in 2007 and, therefore said Attorneys saw nothing or little to be gained by probing NTKN's financials further.

  b. After seeing that NTKN had deferred revenues of $815,994 in 2007 according to the accountant's notes, Plaintiff made inquiries to JED about the deferred revenues through Plaintiff's attorneys. In response, Harada's accountant revised the deferred revenues in 2007 by downgrading them to just over $100,000. The accountant did this despite the accounting provision in the Operating Agreement of Sarastro that restricted him from presenting Plaintiff with financial data which he prepared that was not final and binding.

  c. Because of Harada's ordered restatement of the accounting, whereby Plaintiff was presented with documents marked both as "draft" and "revised draft" when they were required to be final and binding in the first place per the Operating Agreement, the financials Plaintiff received were inherently unreliable and prevented Plaintiff from forming an accurate value judgment of the true financial health of NTKN. This was due both to Harada having full control of the accounting function and information and from his accountant violating the accountant provision of the Operating Agreement.

  d. Certain financials were not provided by Harada, that is, any in 2008, when at least the first quarter's financials should have been available. Plaintiff had no such up-to-date financials when the settlement was finalized in June 2008.

  e. Harada's attorney denied Plaintiff information sought in discovery through Plaintiff's Request for Production of Documents in the referenced State Court suit. In response to request #6 concerning information on NTKN's expenses in Plaintiff's Request for the Production of Documents, Harada's attorney answered, "JED objects to this request as vague and unduly burdensome and because it did not contain date restrictions." Similarly, Harada objected to Plaintiff's attorney's requests in #10 and #11 concerning Annual Accounting as described in section 10.3 of the Operating Agreement and Profits and Losses as defined in section 9.3.

  f. According to a letter dated March 13, 2008 from Harada's attorney, Adam Hackikian, to Plaintiff's Attorney, Harada considered certain documents that Plaintiff was seeking to be "confidential", when no documents should have been confidential and withheld from Plaintiff because Plaintiff was a partner in Sarastro. In other words, Harada was keeping information from Plaintiff that he falsely alleged to be privileged. Harada's attorneys wrote in the above referenced letter that JED was "willing to produce additional confidential documents at a later time", though the time was not specified and on the condition that both parties agreed to a protective order. No protective order was necessary for Plaintiff to have access to any confidential documents that Harada was withholding because of Plaintiff's status as a partner in Sarastro. After having manipulated the financial records of NTKN as described in point a. above, Harada further sought to discourage Plaintiff by creating additional legal hurdles for

8

Plaintiff when none should have existed at all and by increasing litigation costs unnecessarily.

g. Harada willfully concealed his capital transaction with an employee, Christopher Shirley, violating such clause as pertains to capital transactions in the Operating Agreement (Section 15.4 of the Operating Agreement) in relation to Plaintiff's stake. Plaintiff received no notification whatsoever, much less information, on Harada's deal to sell Christopher Shirley a 10% stake in NTKN for $200,000 at the same time that Harada was manipulating the value of Plaintiff's buyout so as to create a false valuation of $15,000 for Plaintiff's stake in Sarastro.

35A. Plaintiff did not know and had no reason or ability to know of the material misrepresentations made to him by Defendants nor did Plaintiff know or have any reason or ability to know that Defendants had failed to provide him with information material to the value of NTKN and Sarastro, Plaintiff hereby refers this Honorable Court to the Affidavit of Gregorie Cox dated May 23, 2014 which is hereby incorporated into the Plaintiff's Second Amended Complaint as **Exhibit 8**.

## COUNT I
## FRAUD IN THE INDUCEMENT/RECISION

36. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 35A above and incorporates same into Count I.

37. The actions of the Defendants as stated in ¶ 36 were designed and intended to cause Cox to execute Exhibit 7 without having the full knowledge of the finances of Sarastro, JED and NTKN, which knowledge was critical and material information necessary to properly evaluate the value of Sarastro in connection with the negotiations leading to the purchase of his interest in Sarastro.

38. It was the intention of the Defendants to cause Cox to sell his interest in Sarastro at a value that was far less than its actual worth so that the Defendants could benefit from the acquisition of that interest by purchasing same at a price that was advantageous to said Defendants.

39. The provision of the revised financials shown on Exhibit 6 by the Defendants to the Plaintiff, the failure to advise Cox of the sale of an interest in JED to a third party and the failure to advise Cox of the increase in monthly revenues for NTKN's subscription services was in violation of the contractual, fiduciary and legal duties imposed on the Defendants as a Seller, fiduciary and partner in the relevant entities involved in this case.

40. The actions of the Defendants as described in ¶ 37 were fraudulent and were designed and intended to induce Cox to enter into Exhibit 7, which contract was not a fair and reasonable agreement which properly reflected the value of Sarastro at the time of its execution.

9

41. Had the information stated in ¶ 39 been provided to Cox prior to the execution of Exhibit 7, Cox would not have executed Exhibit 7 thereby giving up his claims stated in Exhibit 4 in return for the unfair value of Sarastro stated in Exhibit 7.

42. Cox's actions in executing Exhibit 7 under the circumstances was reasonable as he had no reason to know that the representations being made to him at that time were untrue or that there was material financial information that the Defendants were obligated to disclose and were not disclosing.

43. Cox was greatly damaged by his execution of Exhibit 7.

44. Cox is entitled to a rescission of Exhibit 7 and the reinstatement of his claims in Exhibit 4.

**WHEREFORE:** The Plaintiff, Gregorie Cox, hereby requests the following relief from this Honorable Court:

1. An order awarding the Plaintiff with the fair and reasonable damages derived from the actions of the Defendants pleaded in Count I.

2. An order rescinding the release which is Exhibit 7 to this action and a further order reinstating Plaintiff's claims as contained in Exhibit 4 to this action.

3. Interest and attorneys' fees as allowed by law.

## COUNT II
## BREACH OF CONTRACT

45. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 35A above and incorporates same into Count II.

46. The actions of the Defendants in failing to honor the terms and provisions of § 15.4(e), § 10.1, § 10.3 and § 22.1 of the Sarastro Operating Agreement were principal and immediate causes leading to Cox's execution of Exhibit 7.

47. The failure of Defendants to honor said provisions of the Sarastro Operating Agreement constitutes a breach of the Operating Agreement by the Defendants which breach greatly damaged Cox.

**WHEREFORE:** The Plaintiff, Gregorie Cox, hereby requests the following relief from this Honorable Court:

1. An order awarding the Plaintiff with the fair and reasonable damages derived from the actions of the Defendants pleaded in Count I.

2. An order rescinding the release which is Exhibit 7 to this action and a further order reinstating Plaintiff's claims as contained in Exhibit 4 to this action.

    3. Interest and attorneys' fees as allowed by law.

## COUNT III
## TORTIOUS INFRINGEMENT WITH CONTRACT
## AND PROSPECTIVE ECONOMIC ADVANTAGE

    48. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 44 above and incorporates same into Count III.

    49. The actions of Harada were planned, intended and carried out for the purpose of and with the intent of improperly and maliciously depriving Cox of the fair value of his interest in Sarastro. At all times material to this action Harada knew that his actions as described herein would have the consequence of so depriving Cox of the fair value of his interest in Sarastro and would further have the consequence of unjustly enriching Harada, JED, NTNK and Sarastro. Said actions of Harada constitute tortious interference with the contract between Cox and Sarastro and further constitute a tortious interference with Cox's prospective economic advantage.

    **WHEREFORE:** The Plaintiff, Gregorie Cox, hereby requests the following relief from this Honorable Court:

    1. An order awarding the Plaintiff with the fair and reasonable damages derived from the actions of the Defendants pleaded in Count III.

    2. An order rescinding the release which is Exhibit 7 to this action and a further order reinstating Plaintiff's claims as contained in Exhibit 4 to this action.

    3. Interest and attorneys' fees as allowed by law.

## COUNT IV
## VIOLATION OF THE
## ILLINOIS LIMITED LIABILITY COMPANY ACT

    50. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 44 and 49 above and incorporates same in Count IV.

    51. the actions of Harada as described in ¶ 49 of this Complaint constitute a breach of Harada's fiduciary duty of loyalty towards Cox as said duty is established by the Illinois Limited Liability Company Act, 805 ILCS 180/15-3.

    52. Harada's breach of fiduciary duty has severely damaged Plaintiff.

    **WHEREFORE:** The Plaintiff, Gregorie Cox, hereby requests the following relief from this Honorable Court:

    1. An order awarding the Plaintiff with the fair and reasonable damages derived from the

actions of the Defendants pleaded in Count IV.

2. An order rescinding the release which is Exhibit 7 to this action and a further order reinstating Plaintiff's claims as contained in Exhibit 4 to this action.

3. Interest and attorneys' fees as allowed by law.

## COUNT V
## VIOLATION OF FEDERAL SECURITIES LAW

53. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 49 above and incorporates same in Count IV.

54. In connection with the purchase of Cox's five percent interest in Sarastro the Defendants, in particular, Harada, employed false, manipulative and deceptive practices, actions and representations for the purpose and with the intent of inducing Cox to sell his five percent interest in Sarastro for far less than said interest was worth.

55. The false, manipulative and deceptive representations and actions of the Defendants included, but are not limited to the publishing of false and deceptive financial statements to Cox, the failure to advise Cox of the truth of the information contained in and represented in said financial statements, the failure to advise Cox of a third party sale of an interest in JED and other statements, acts and representations that were false and deceptive and which caused Cox to sell his interest in Sarastro for far less than what it was worth.

56. In reliance on said knowingly false representations and the failure of the Defendants to provide to Cox initial financial information bearing on the value of Sarastro and NTKN, Cox sold his interest in Sarastro for less than $15,000.00.

57. The Defendants' actions are violative of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10(b)(5) which prohibits the use or employment, in connection with the purchase or sale of any security, of any manipulative or deceptive device or contrivance in contravention of the rules of the Securities and Exchange Commission.

**WHEREFORE:** The Plaintiff, Gregorie Cox, hereby demands Judgment against the Defendants, Harada, JED, NTKN and Sarastro on this Fifth Cause of Action in an amount sufficient to compensate Cox for his losses plus interest, costs and Attorney's fees as allowed by Section 10(b) of the Securities and Exchange Commission of 1934 (15 U.S.C. §78j(b) and Rules 10b-5 (17 CFR 249.10b-5).

## COUNT VI
## COMPLAINT FOR ACCOUNTING

58. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 49 above and incorporates same in Count IV.

59. Section 15.5 of Exhibit 1 states as follows:

"15.5 Adjustment of Percentage Interests. In the event that Need to Know News has cash flow from operations greater than zero on a monthly basis for any three (3) consecutive months prior to the first (1st) anniversary hereof, JED Capital shall transfer a total of five percent (5%) of its interests to each of the Employee Members. Further if such event occurs prior to the second anniversary of the date of this Agreement at such time JED Capital has received distributions from the Company in an amount equal to 100% of the aggregate Capital Contributions made by JED Capital to the Company and has been paid all outstanding principal and interest under all loans made by JED Capital to the Employee Members, each Employee Member shall have the right to purchase from JED Capital an additional 5% of the interests for a price of Book Value multiplied by 2.0."

60. On information and belief the cash flow from the operations of NTKN for the periods relevant to said section was sufficient to trigger Cox's rights pursuant to said section.

61. Cox was never provided with financial information appropriate and necessary to determine whether said Section 15-5 was operative.

62. As a member of Sarastro, Cox was entitled to see and consider all of such financial information.

63. Cox is entitled to an accounting of all financial transactions of NTKN during the relevant time period covered by said Section 15.5.

**WHEREFORE**: The Plaintiff, Gregorie Cox, hereby requests an order of this Honorable Court requiring the Defendants, Harada, JED, NTKN and Sarastro, to provide him with all financial information of NTKN relevant to the terms and conditions of Section 15-5 of the Operating Agreement of Sarastro Capital, LLC.

## COUNT VII
## FRAUDULENT CONCEALMENT

64. The Plaintiff, Gregorie Cox, hereby realleges and incorporates the facts contained in ¶¶9 thru 49 of the Plaintiff's Complaint and incorporates same into Count VII.

65. The misrepresentations of the Defendants as stated above acted to conceal the true value of Sarastro and NTKN from Cox.

66. Cox had no knowledge of the falsity of the representations made to him or to what Defendants failed to tell him.

67. Cox justifiably relied on the information provided to him.

68. Cox was completely reliant on Harada's expertise and knowledge as to the financial information relevant to the value of Sarastro and NTKN.

69. The Defendants provided Cox with misinformation and failed to provide relevant material information for the purpose and with the intent of inducing Cox into selling his share of Sarastro for less than its value.

70. Cox was severely damaged by the Defendants' actions.

**WHEREFORE**: The Plaintiff, Gregorie Cox, hereby requests an order of this Honorable Court requiring the Defendants, Harada, JED, NTKN and Sarastro, to provide him with all financial information of NTKN relevant to the terms and conditions of Section 15-5 of the Operating Agreement of Sarastro Capital, LLC.

## COUNT VIII
## CONTRACT ACTION AGAINST NTKN

71. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 49 and 58 through 63 above and incorporates same into Count VIII.

72. As the sale of Plaintiff's interest in Sarastro was obtained through fraud and breach of contract, Plaintiff has been at all times material to this action, a continuing member of Sarastro entitled to all of the financial and membership benefits accruing to the Members of the LLC and Plaintiff, to this day, remains a five percent (5%) owner of NTKN with a right to become a ten percent (10%) owner of Sarastro and the equity of NTKN.

73. Plaintiff is, therefore, entitled, as a matter of contract, to his share of all previous profits accruing to NTKN as well as Plaintiff's share of the sale of NTKN, to the German Stock Exchange in 2009.

**WHEREFORE**: The Plaintiff, Gregorie Cox, hereby demands judgment against the Defendant, NTKN, in an amount sufficient to satisfy his claims pursuant to the allegations of Count VIII.

## COUNT IX
## BREACH OF CONTRACT OF COVENANT OF
## GOOD FAITH AND FAIR DEALING

74. The Plaintiff, Gregorie Cox, hereby restates the allegations contained in ¶¶ 9 through 49 and 58 through 63 above and incorporates same into Count IX.

75. To the extent that any of the Defendants had a contractual right to purchase Plaintiff's interest in Sarastro in 2006 pursuant to Section 15 of Sarastro's Operating Agreement, that right existed only at the fair market value of Plaintiff's interest because Plaintiff was terminated as an employee of Sarastro without cause.

76. The termination of Plaintiff as an employee of Sarastro was done for the purpose and with the intent of first, enforcing a noncompetition clause contained in the Operating Agreement against Plaintiff and implemented, to prevent Plaintiff from being able to acquire an additional five percent (5%) interest in Sarastro pursuant to §15.5 of the Operating Agreement, a clause and option which Plaintiff specifically desired, bargained for and expected to benefit him at the time that he became both and employee and member of Sarastro.

77. Plaintiff alleges that Defendants were well aware of Plaintiff's rights and options as stated in ¶76 and that Plaintiff's termination was done for the purpose and with the intent of destroying Plaintiff's ability to be paid fair market value for his interest in Sarastro and his ability to benefit from receiving an additional five percent (5%) equity interest in Sarastro. Indeed, Plaintiff alleges that it was always the intent of the Defendant, Harada, to terminate Plaintiff at the appropriate time in order to deprive Plaintiff of these rights and expectations.

78. Additionally, during the process of terminating the Plaintiff's employment with Sarastro the Defendant, John Harada, acted deviously and maliciously by falsely using the cover of the Operating Agreement to send Plaintiff a notice that Sarastro was exercising its option to purchase Plaintiff's interest in Sarastro at book value while ignoring Section 15.4(d) of the Operating Agreement which restricted Sarastro from exercising such an option and by filing an abusive lawsuit seeking to enforce Sarastro's purported right to purchase Plaintiff's interest in Sarastro at book value, which lawsuit was premised on dishonest and fraudulent representations.

79. Notwithstanding the Defendants' actions as described in ¶¶ 74, 75, 76, 77, 78 above, Defendants knew at all times material to this case that their actions were improper, in breach of contract and intended to unfairly and in bad faith deprive Plaintiff of his contractual rights all to the benefit of the Defendants.

80. In exercising rights under the Sarastro Operating Agreement the Defendants were obligated to use any discretion granted by said agreement with due regard for and consistent with Plaintiff's reasonable expectations and contractual rights as expressed by said Operating Agreement.

81. The actions of the Defendants as described in this Count are violative of the covenant of good faith and fair dealing owed by all of the Defendants to the Plaintiff pursuant to the terms and conditions of the Operating Agreement and by and through the Illinois Limited Liability Act. Said actions severely damaged Plaintiff by depriving him of the financial benefits of his membership interest in Sarastro which membership interest would have been increased from 5% to 10% due to the financial success of NTKN after June of 2008.

82. Further, the Settlement Agreement dated June 18, 2008 is unenforceable due to the Defendants' fraudulent conduct, the overly broad release language of the Operating Agreement of Sarastro and the egregious breaches of fiduciary duty on the part of the Defendants as described herein.

WHEREFORE: The Plaintiff, Gregorie Cox, hereby demands judgment against the Defendants for breach of the covenant of good faith and fair dealing in an amount sufficient to satisfy Plaintiff's damages along with attorneys' fees, costs and punitive damages and an order of this Honorable Court rescinding the Settlement Agreement dated June 18, 2008, restoring Plaintiff to his position as a member of Sarastro with all of the benefits and rights stated in the Sarastro Operating Agreement.

        The Plaintiff, GREGORIE COX,
By his Attorney,


  /s/ Robert D. Loventhal
ROBERT D. LOVENTHAL, ESQ.
BBO NO. 305940
21 CUSTOM HOUSE STREET
SUITE 210
BOSTON, MA   02110
(617) 723-2222 PH
(617) 723-9811 FX
Email:  RDLLAW99@aol.com

  Certificate of Service

    The undersigned certifies that the Plaintiff's Second Amended Complaint was filed electronically in compliance with the General Order on Electronic Case Filing, Section III(B)(1). As such, these documents were served on all counsel who are deemed to have consented to electronic service. Fed. R. Civ. P. 5(b)(2)(D) and Local Rule 5.9.

Dated:_6/9/2014____        __/s/ Robert D. Loventhal_____
                                                  ROBERT D. LOVENTHAL, ESQ.